UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
In re:                            :
                                      Docket #12mj2559
UNITED STATES OF AMERICA,          : 1:12-mj-02559-UA

                 Plaintiff,       :

   - against -                    :

LUSTYIK, JR.,                     : New York, New York
                                    October 1, 2012
                 Defendant.       :

------------------------------------ :
```

PROCEEDINGS BEFORE
MAGISTRATE JUDGE FRANK MAAS,
UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

APPEARANCES:

```
For the United States    U.S. ATTORNEY'S OFFICE
     of America:         SOUTHERN DISTRICT OF NEW YORK
                         BY:  BRENDAN ROBERT MCGUIRE, ESQ.
                               MARIA LERNER, ESQ.
                         One Saint Andrew's Plaza
                         New York, New York 10007
                         (212) 637-2220


For the Defendant:       MARCUSO RUBIN & FUFIDIO
                         BY:  ANDREW ALAN RUBIN, ESQ.
                         1 North Broadway, 12th Floor
                         White Plains, New York  10006
                         (914) 761-9200


Also present:            RAYMOND MANSOLILLO, ESQ.
                         Boston, Massachusetts



Transcription Service:   Carole Ludwig, *Transcription Services*
                         141 East Third Street #3E
                         New York, New York 10009
                         Phone:  (212) 420-0771
                         Fax:  (212) 420-6007
```

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service

<u>INDEX</u>

<u>E X A M I N A T I O N S</u>

|  |  |  | Re- | Re- |
| --- | --- | --- | --- | --- |
| <u>Witness</u> | <u>Direct</u> | <u>Cross</u> | <u>Direct</u> | <u>Cross</u> |
| None | | | | |

<u>E X H I B I T S</u>

| Exhibit | | | | Voir |
| --- | --- | --- | --- | --- |
| <u>Number</u> | <u>Description</u> | <u>ID</u> | <u>In</u> | <u>Dire</u> |
| None | | | | |

```
 1            THE CLERK:   U.S. v. Lustyik.  Counsel, please state
 2  your names for the record.
 3            MR. BRENDAN ROBERT McGUIRE:   Good afternoon, Your
 4  Honor, Brendan McGuire for the United States.  Along with me
 5  at counsel table, Maria Lerner and Jeanette Gunderson of the
 6  Department of Justice and next to them are Tom Hopkins and
 7  Steve Perrera of the Department of Justice, Office of the
 8  Inspector General.
 9            MR. ANDREW ALAN RUBIN:   Good afternoon, Your
10  Honor, Andrew Rubin, 1 North Broadway, White Plains for Mr.
11  Lustyik.
12            MR. RAYMOND MANSOLILLO:   Your Honor, Ray
13  Mansolillo for Mr. Lustyik.  I'm from Boston.  I'd ask to by
14  my motion filed pro hoc I can --
15            HONORABLE JUDGE FRANK MAAS (THE COURT):  You're
16  admitted for purposes of this proceeding.
17            MR. MANSOLILLO:   That's correct.
18            THE COURT:   If you wish to continue representing
19  Mr. Lustyik, you'll have to file the appropriate papers and
20  there's a fee that goes along with that.
21            MR. MANSOLILLO:   Okay, Your Honor, thank you.
22            MR. RUBIN:   Your Honor, so I'll file the
23  appearance under my name, but Mr. Mansolillo is far more
24  familiar with the facts and circumstances of the case than I
25  am.
```

4

1          THE COURT:   Okay.  And hand up your appearance
2   sheet.   I take it this was an arrest?
3          MS. LERNER:   Yes, Your Honor.
4          THE COURT:   At what time?
5          MS. LERNER:   I believe it was approximately four
6   o'clock on Saturday afternoon.
7          THE COURT:   Agent Perrera, do you swear that the
8   information in your affidavit is true and correct and that
9   your signature appears at the last page?
10          MR. PERRERA:   Yes, Your Honor.
11          THE COURT:   Thank you, sir.  Mr. Lustyik, this
12   afternoon I'm going to advise you of your rights.  I'll
13   inform you of the charges against you.  I'll determine
14   whether you need to have counsel appointed and whether there
15   are conditions under which you can be released.
16          You have the right to remain silent and are not
17   required to make any statements.  Even if you have made
18   statements to the authorities, you need not make any further
19   statements, and anything that you do say can be used against
20   you.
21          You also have the right to be released, either
22   with conditions or without conditions, pending a trial of
23   this matter unless I find that there are no conditions that
24   would reasonably insure both your presence in court and the
25   safety of the community.

1          Last, you have the right to be represented by

2   counsel during all court proceedings, including this one,

3   and during any questioning by the authorities.  You are

4   represented by two retained counsel today, but if for any

5   reason you were unable to afford counsel, you could ask that

6   counsel be appointed to represent you.

7          You've been charged in the District of Utah in a

8   multi-count indictment which --

9          MS. LERNER:   Your Honor, it's a complaint.

10         THE COURT:   It's a complaint?  I'm sorry?

11         MS. LERNER:   It's a complaint.

12         THE COURT:   Thank you, in a multi-count complaint

13  which charges you with four different crimes.  In Count One

14  you're charged with having violated Title 18 United States

15  Code, Section 371, by conspiring together with others to

16  obstruct the due administration of justice, obstruct an

17  agency proceeding, and commit Honest Services wire fraud.

18  In Count Two you are charged with the substantive crime of

19  wire fraud in violation of Title 18 United States Code,

20  Sections 1343 and 46.  In Count Three you're charged with

21  obstruction of justice in violation of Title 18, United

22  States Code, Section 1503A, and last you're charged in Court

23  Four with obstruction of an agency proceeding in violation

24  of Title 18, United States Code, Section 1505.  On those

25  last three Counts you also may be charged as an aider and

6

1  abettor in violation of Title 18 United State Code, Section

2  2.  Each of those crimes carries with it a number of

3  potential sanctions, including jail time.

4       Counsel, have you seen the complaint and had an

5  opportunity to review it with your client?

6       MR. MANSOLILLO:   Yes, I have, Your Honor.

7       THE COURT:   And do you waive its public reading?

8       MR. MANSOLILLO:   Yes, I do, Your Honor.

9       THE COURT:   With regard to these charges you're

10 entitled to -- bear with me a second.  With regard to these

11 charges, sir, you have the right to a hearing at which the

12 Government will have the burden of establishing that there's

13 probable cause to believe that these crimes were charged and

14 that your crimes charged were committed and that you're the

15 person who committed them.

16       You're also entitled to a hearing on whether you

17 are the person named in the warrant.  It take it there's no

18 identity issue here, counsel, is that correct?

19       MR. MANSOLILLO:   That's correct, Your Honor.

20       THE COURT:   That hearing must be held within at

21 14 days.  If at the end of this afternoon's proceeding you

22 remain in custody or within 21 if you're released on bail.

23 But if an indictment or criminal information is filed

24 against you prior to the preliminary hearing date, then the

25 only hearing you would be entitled to is an identity hearing

1  which just has been waived.

2          If you decide to enter a plea of guilty or do not

3  contest your guilt you could ask to have the plea and

4  sentencing phases of your case occur in this District but

5  that would require the consent of the prosecutors both here

6  and in the District of Utah.  So if you plea not guilty or

7  both of the prosecutors do not agree to proceed here, then

8  you'll have to go back to the District of Utah for all

9  further proceedings.

10          What's the Government's position with respect to

11  bail?

12          MS. LERNER:   Your Honor, as you know, we filed a

13  motion to have Mr. Lustyik detained without bond pending

14  trial and we are prepared to proceed today through proffer.

15          THE COURT:   And I take it that counsel will be

16  making an application for bail?

17          MR. MANSOLILLO:   Yes, Your Honor, and I'm ready

18  to proceed.

19          THE COURT:   Have you received a copy of the

20  motion that was submitted?

21          MR. MANSOLILLO:   I received it at one o'clock

22  this afternoon, yes, Your Honor.

23          THE COURT:   Okay.  Is there anything that the

24  Government wishes to add beyond what's in the memorandum?

25          MS. LERNER:   Your Honor, I just wanted to

1   particularly stress the additional information that the

2   Government learned recently, which is the reason that we

3   moved so quickly against Mr. Lustyik.  We learned just last

4   week, as is pointed out in our motion, that in addition to

5   all of the obstructive acts that Mr. Lustyik committed as

6   alleged in the second amended complaint, the Government has

7   recently come into knowledge that he attempted to sell

8   information to -- sensitive law enforcement information to a

9   target of a murder-for-hire investigation.

10         The Government is in possession of evidence that

11   as he was negotiating for the sale of that information,

12   defendant Lustyik was aware that the person to whom he was

13   attempting to sell that information may have had an interest

14   in murdering the individual about whom Mr. Lustyik was

15   providing information.

16         In addition, when the search warrant was conducted

17   at Mr. Lustyik's house approximately two weeks ago a

18   classified document was found there, which is a violation of

19   FBI regulations and possible federal felony laws.

20         During the execution of that search warrant, Mr.

21   Lustyik became extremely angry and cursed repeatedly at two

22   New York State Troopers who were there merely to secure the

23   scene and served no other purpose, and had no other

24   involvement in the investigation.  And yet his conduct

25   towards them was offensive to those State Troopers.  His

1    mood was so volatile at the scene that when the officers

2    learned that he had firearms, they asked that he voluntarily

3    surrender them to the FBI because they feared that leaving

4    those weapons with Mr. Lustyik in that mood would've been

5    dangerous.

6           THE COURT:   Did he surrender them?

7           MS. LERNER:   He did surrender them, Your Honor.

8    In addition, the day after the search warrant was executed,

9    another agent was visiting Mr. Lustyik at his home, and

10   during which time Mr. Lustyik asked the agent to destroy a

11   file of the FBI regarding an investigation on which Mr.

12   Lustyik had worked.

13          These are actions that were taken after Mr.

14   Lustyik was suspended, stripped of his badge, and stripped

15   of his authority, and yet he took those actions even after

16   the gig was up, Your Honor.  The Government contends that

17   there are simply no conditions of release that would

18   guarantee the safety of the community.  We have laid out in

19   detail in our motion what Mr. Lustyik thinks of direct

20   orders given to him.  He blatantly states that he will not

21   follow them.

22          The obstructive conduct that began in the Utah

23   matter is a cancer that has metastasized beyond that matter

24   and we submit, Your Honor, that there are simply no

25   conditions of release, no GPS monitoring, daily reporting,

1  high-cash bond, that could've prevented, for example, the

2  exchange at his home where he asked the agent to destroy the

3  file.  Detaining him without bond is the only way to insure

4  that the danger to the community is preserved.

5          THE COURT:  Well, how, if I detain him, is that

6  insured since he can have visitors and presumably could

7  communicate directly or indirectly the same sorts of

8  requests?

9          MS. LERNER:  Of course, Your Honor, and that is

10  absolutely true.  In one of the cases that we cite that very

11  question was asked, and the Court, if you would just give me

12  a moment to find it.

13          THE COURT:  Sure.  For some reason I don't have--

14  I read the memo but I don't have it in front of me.

15          MS. LERNER:  I think it's in a portion of the

16  case that was not cited, but the court did specifically

17  address that particular issue, and noted that even though

18  there is no absolute guarantee if he is held without bond,

19  at least his actions and his communications are being

20  monitored while he is detained, whereas if he is free on

21  bond, he has extreme latitude in conducting his obstructive

22  activities.

23          And I will again point out, as laid out in the

24  complaint and the motion, he simply does not stop.  When one

25  thing doesn't work, he tries another.  During his

1 | obstructive conduct in the Utah investigation he started by

2 | trying to convince the agents they had no case.  When that

3 | didn't work, he turned to the AUSAs.  When that didn't work,

4 | he created 302s with the specific intent to create damaging

5 | material in that case.  When that didn't work, he attempted

6 | to sell Mr. -- to shop Mr. Taylor around to other agencies

7 | as a potential confidential source.  And when that didn't

8 | work, he tried to recruit other FBI and DOJ officials to try

9 | to effectuate that obstructive conduct.  He simply does not

10 | stop.  He does not follow orders.  He is a danger to the

11 | community and there is absolutely no way to guarantee that

12 | he would not continue to do so from jail, Your Honor, but at

13 | least there's a way to monitor his activities if he is

14 | detained.

15 |         THE COURT:   Thank you.

16 |         MR. MANSOLILLO:   Your Honor, I would rigorously

17 | contest what's stated in both complaint one, both complaint

18 | two, the amended complaint two, and this detention order.

19 | And quite frankly, there's not much difference with the

20 | exception of what the prosecutor had just mentioned, that

21 | they allege they just found out.

22 |         This case, and I intend to do most of this by

23 | proffer, but I also have some witnesses.  This case has

24 | languished on for over three years in Utah.  It started out

25 | with a contractor that worked for the military.  The

1    contractor had all kinds in sources.  He's been a contractor

2    for 25 years.  He's also worked for various government

3    agencies, the CIA, the FBI, DEA, ATF, okay.  This is all

4    stuff that the Government has put out.

5           He gets contacted by a colonel.  The colonel asked

6    him if he will partake in a contract.  Only five people can

7    be vetted in that contract because they had prior clearances

8    and was he interested.  It's worth a lot of money, $800,000

9    every six months, and it may be continued.

10          The colonel asked him if he can -- if he will take

11   in a retired Army officer.  The Army officer would be the

12   in-country manager for the contract.  Mr. Taylor says yes.

13   It goes on for several years.  Mr. Taylor, they find out

14   that the in-country manager is bribing or receiving bribes

15   from the colonel.  The colonel is taking kickbacks in the

16   amount of $17 million -- lot of money.  It starts out with

17   the colonel and then they go after Mr. Taylor.

18          While this is going on, an FBI agent for 24 years

19   and 4 months and the only -- that's never, ever been

20   disciplined by the FBI.  I'm a retired DEA agent for 20

21   years and I can tell you, Your Honor, that's a remarkable

22   feat to go 24 years without being disciplined.

23          He meets Mr. Taylor at a football game at Bryant

24   University in Rhode Island.  They become friends.  They

25   talk.  This is not your typical drug informant that's trying

1  to work off a beef at the time.  He's provided information

2  for years, the ATF, the CIA, a lot of information which is

3  national security and I'm not going to discuss it because

4  this is not a closed session.

5          While this is going on, my client is attempting to

6  work him as a source.  He has information.  He's going

7  through the chain of command.  He's going through his

8  supervisor, he's got agents that work with him, and I've

9  gone through the process with him.  He would have had to

10 manipulate over 30 FBI agents, Your Honor, to do what they

11 said he's trying to do.  He was simply trying to bring it to

12 the U.S. Attorney's attention to see if he could continue

13 working that source with the FBI because of serious national

14 implication issues that their interference would -- may have

15 jeopardized lives.

16         This was jumped to a conclusion by an OIG officer

17 that started out with the Department of Defense.  They

18 started getting e-mails.  As this went along there were e-

19 mails of Mr. Taylor while he was overseas conducting

20 business and there were also e-mails between Mr. Lustyik and

21 a person two in that, who is a businessman, and Mike Taylor.

22         These e-mails that they've interpreted fit their

23 scheme of what they think transpired.  The chief of the

24 criminal division in Utah has been contacted.  He said,

25 quote, to two people, one from the FBI, if somebody comes to

1   me that has authority, meaning not a street agent and not a

2   GES, we'll consider this information, we'll look at it.

3   This information has a vetting process.  His supervisor at

4   DEA orders him to vet this person.

5            THE COURT:   You mean at the FBI.

6            MR. MANSOLILLO:   The FBI, I'm sorry, orders him

7   to vet this information.  He's vetting the information and

8   the Utah office seems to think that the FBI, which they do

9   quite often and quite frankly all the time take over other

10  people's investigations because it's more serious.  He is

11  vetting the people.  He is vetting old handlers.  He's --

12  what's in these reports is either poor investigative work or

13  outright lies by OIG.

14            They investigate and they talk to the FBI handlers

15  who supposedly hate this individual Mike Taylor -- it's all

16  laid out in the complaint.

17            THE COURT:   But one of the things they allege is

18  that Taylor either gave or promised your client 200,000

19  bucks in cash in order to secure certain benefits.

20            MR. MANSOLILLO:   Right, it never happened, Your

21  Honor.  And if they did this -- and one of the most suspect

22  aspects of this case is, all right, and I was told that we

23  can't contact the FBI because, quote, well, they didn't

24  quote anything.  We can't get into it right now.  But the

25  implication was that the whole entire thousand agents, all

1  the way up to the top, are corrupt, all right, which I find

2  ludicrous.  This office of the FBI is the biggest office in

3  the country and has its pulse on every terrorism and

4  intelligence operation in the world.

5          Getting back to their investigation, they allege

6  and mix-match business conduct that's going on with an

7  individual as number two, they call number two in here, with

8  my (indiscernible).  There is no way that my client could

9  have, being an FBI agent, not being an FBI agent, that was

10  his procedure.  Let's get our case.  Let's make sure that

11  it's very strong.  And if this information is real, which

12  they have an Iranian specialist from the FBI that's vetted

13  the information, okay.  They had -- the counsel came down to

14  the meeting that actually opened up the classified release,

15  okay.

16          He can't order these things to happen.  They come

17  from right -- all the way from the top.  There is no way,

18  this case is so weak, there's no way what they're alleging

19  he could do, he can't -- he doesn't have the authority to

20  dump a case.  His only authority is to vet it as best he can

21  and then bring it to his supervisors.

22          Well, they say he keeps persisting.  One of his

23  supervisors who's never been in the intelligence, counter-

24  intelligence unit, says keep working it, keep vetting it, he

25  orders to him.  He tries to get out of the case.  This is

1    becoming a pain.  I don't want to do it.  It doesn't look

2    like they're even going to entertain, even if it's just

3    cooperation.  His supervisor makes him stay in the case.

4         Also, his supervisor and the ASAC have contacts

5    with Utah about this national security information.  There

6    was an individual that was killed in the Middle East during

7    an operation with the CIA and the FBI, and Mr. Taylor was

8    very upset because the FBI wasn't supposed to contact the

9    sub-source.  The sub-source was contacted and the person was

10   killed in his hometown in Lebanon.  He's an Arabic speaker,

11   a U.S. citizen, he's an Arabic speaker.  He had a huge fight

12   with a boss at the FBI.  There's a blur in one of their

13   computer systems that they haven't even checked, or asked to

14   check, that states what transpired in that argument.

15        That was the reason that he was getting resistance

16   from his supervisor.  It went on to other people.  Mr.

17   Taylor also was working operations with DEA at the time in

18   Florida, all right.  The agents, the supervisors, the U.S.

19   attorneys, the ASACs, all the way up to the top, Your Honor,

20   talked to Utah and they talked to a gentleman by the name of

21   Vedi (phonetic).  He's the chief of enforcement and he goes

22   I'm not going to impede on a national security operation.

23        While this is going on, Utah is afraid.  And I

24   don't know if they're afraid or that they think that the

25   case is so important, they contact OIG to jump in.  Before

1    they were under investigation, which a normal investigation

2    would be OIG would contact OPR at FBI, they would have done

3    a forensic examination, all right.  I'm doing this case pro

4    bono because he only can pay expenses.  It's going to be in

5    Utah.

6            His family has been here in Tarrytown, he's lived

7    there for 50 years.  His mother's been there twice as long.

8    His brother's a policeman.  His wife is a former FBI

9    employee who's now a school teacher two days a week.  His

10   entire roots are here.  There is no way that he could have

11   done what they're alleging.  Their complaints are

12   outlandish.

13           On top of his 50 years here, and he chose to stay

14   in New York.  He was here.  Usually agents get -- not a lot

15   of agents want to come to New York.  He chose to stay, he

16   was able to stay.

17           On top of it, and again I'll repeat, his character

18   has been unmarred.  And when you go through that type of --

19   he's got to go -- he has to take polygraphs every time if he

20   travels overseas when he comes back if he had contact with a

21   source.

22           There's an allegation in here about drop boxes and

23   there's a ton of allegations in here about he violated FBI

24   policy procedure.  Well, one of the new policy procedures

25   since 9/11 and since CIA and FBI working together, and

1   that's what he does.  He's a true spy hunter.  He works on

2   the counter-intelligence side.  He's done that for his whole

3   career.  One of the new provisions is if you talk to a

4   source overseas you have to contact the FBI first.

5          As I told you, Mr. Taylor had a problem with the

6   CIA and the FBI before.  He set up a drop box, yeah, he went

7   around policy.  He didn't call.  And the CIA called this

8   boss and said, oh, don't talk to Mike Taylor, okay, unless

9   you call me first.  He sets up a drop box.  They think it's

10  the secret way to hide nefarious information that's

11  happening.  There's things in here that the businessman or

12  the real estate individual that Mr. Taylor knew before he

13  even knew him.  He knows him because he's from the same

14  town.  He says, hey, work with Mr. Taylor and you might get

15  a job opening and you might be able to put something

16  together.

17         He goes over there and works over there.  They're

18  using -- he's using the drop box for national security

19  information that's going through.  Now, mind you, it's not

20  criminal because it doesn't get vetted until -- once it gets

21  vetted through the analyst section of the FBI, it becomes

22  classified, so this is raw material.  However, it's still

23  sensitive.  It could get people killed and it damage

24  people's lives.

25         They interpret this secret, quote, secret drop box

1   with business allegations.  There's stuff in here about $50

2   million of oil business, this, that and the other, and I'll

3   give you one example out of here about how outrageous it is.

4   There's a South Sudanese individual that they refer to as a

5   government official, okay.  He's a rebel leader.  Mr. Taylor

6   knows him.  Mr. Taylor has contacts everywhere.  He's a

7   security contractor.  He works for anybody that pays.

8          The rebel leader wants to set up because they're

9   going take over, or they're going to secede from Sedan.

10  Nobody believes this.  They have no idea that that would

11  even happen.  Well, the FBI had information that it was

12  happening and it did.  The information came in June and it

13  happened in July.

14         Mr. Lustyik's contact with the South Sudanese

15  individual government official was in an undercover capacity

16  to get the information to work him as a double agent.

17  That's what he does.  If you look in his file, your file,

18  you can find double agents that he worked with and set up in

19  New York and throughout the country and the world.

20         They take that information and elaborate on in

21  wildly.  I mean, I don't know, it's like something out of a

22  novel that they write.  If OPI from FBI and OIG got together

23  and called him into the office and say, whoa, what's going

24  on here?  They would've found out all this thing

25  immediately.  I want to get to something that's even more

1   disturbing.

2           They not only do what they --

3           THE COURT:   What you're telling me is it's a

4   triable case.

5           MR. MANSOLILLO:   Absolutely and I'm going to get

6   -- what I wanted to do was refute because I waived it.   It's

7   just some of the items that they allege and put in there,

8   which equally disturbing is, they call Mr. Taylor in.   Come

9   in from Lebanon.   They're indicted.   He comes in.   He meets

10  with his attorney.   He gets his passport.   They fly to Utah.

11  He gets in his hotel room.   He's talking to his attorney in

12  his hotel room.   He's going to turn himself in, in the

13  morning.   They kick his door down and say he obstructing and

14  now he's being held without bail.   That -- what's going to

15  happen in this case, they're going to have to start another

16  investigation.

17          They did the same thing to my client, here, to try

18  to keep him, to be held without bail so he can't have

19  representation or good representation and I can't have

20  access to him, or it would be more difficult.

21          His mother -- the father was a landscaper.   He

22  tries to help everybody in the community.   He helped

23  baseball, he's a coach, soccer, he's a coach.   He mentors

24  kids.   They're trying to keep him out.   Well, what they do

25  in this case is, first they call me up and ask if he has

1  anything to say after they did a search warrant on his house

2  on the 18th, after they get the initial complaint.

3         They do a search warrant on his house like it's

4  the Raid on Inchon.  He's an FBI agent.  The associate

5  director in charge said let me do the -- by protocol.  I'll

6  call him down; I'll have him come into the office, sit

7  there.  I'll tell his wife to take the kids out.  They've

8  got to do something.  He has children, six and eleven.

9         I intend to put his wife on the stand to tell you

10  what happened.

11         THE COURT:  Well, we're probably not going to

12  have --

13         MR. MANSOLILLO:  Okay.

14         THE COURT:  The custom in this District --

15         MR. MANSOLILLO:  Right.  Okay.  All right.

16         THE COURT:  -- just so both sides are aware is

17  typically to have proffers, not evidentiary hearings.

18         MR. MANSOLILLO:  I understand.  They rush up to

19  the house, do this raid.  He's not there at the time.  They

20  overruled the ADIC, and excuse my term but it's an acronym

21  for the associate director in charge of the FBI, the highest

22  person that runs the New York office, probably the most

23  powerful person in law enforcement and intelligent services.

24         They, from Washington, stand down.  While this is

25  going on, they're there for so long, they're there for like

1  three, four hours, the kids are crying, guns.  This is

2  basically a document search warrant, a document search

3  warrant, shotguns, guns.

4          An agent ordered by a supervisor to drive him back

5  so he can get any FBI property because we have to suspend

6  them pending what's happening.  He goes back.  He stands

7  this far from the trooper that they mention in here, that

8  they lie about in here.  This far from the trooper, and I

9  have an agent that will testify to it, and his daughter is

10  crying behind two troopers, like this, in uniform, crying

11  hysterically.  He says, please bring my daughter here to me,

12  all right.  The other FBI agent, his partner's right next to

13  him, they start smirking and antagonizing him while his

14  daughter is crying hysterically behind him.  The FBI agent,

15  his other FBI agent, Sarah Jones, said what's the matter

16  with you guys?  Are you guys -- what are you doing?  Don't

17  do that.

18          They try to say that he was out of control.  I'll

19  tell you, I might have done more if somebody did that to me

20  with my daughter standing there, hysterically crying.  They

21  try to flip it around to hold him, okay.

22          Now on top of this, after this happens, they want

23  him to cooperate, okay, and I'm not going to get into that

24  whole thing, but he goes, they got the whole thing wrong.

25  He says, this is not happening, they're mixing this up.  He

23

1   says, if I had cooperated they'd have to, you know, I'd have

2   to perjure myself.  So I call them back, I say, please, he

3   doesn't have anything to say but please do me a favor.  It

4   looks like you're going to arrest him.  Please, I will

5   surrender him to Utah.  I will surrender him to the FBI.  I

6   will surrender him to OIG.

7          I also contacted the FBI, okay, just to make sure

8   that they weren't involved in this outrageous activity.

9   They told me they had to stand down, they were ordered to

10  stand down, but no.  They're trying to obtain documents from

11  the FBI without search warrants.  They threw them -- they

12  got thrown out.

13         They tell me they'll do their best to give me a

14  call --

15         THE COURT:   Last time I checked --

16         MR. MANSOLILLO:   I'm sorry?

17         THE COURT:   -- the FBI is part of the Department

18  of Justice.

19         MR. MANSOLILLO:   That's correct.

20         THE COURT:   Whether would the OIG need a search

21  warrant to get something from the FBI?  Am I mistaken?

22  Maybe I misunderstood you.

23         MR. MANSOLILLO:   Well, that's what I was told.

24         THE COURT:   I don't know why that would be.

25         MR. MANSOLILLO:   Anyways, obviously you can see

24

1    the contention as to what happened, how this whole case

2    started, and it wouldn't have happened that way if they

3    worked with the FBI from the beginning.  And then that's a

4    different story, it's not him.

5              THE COURT:   Tell me what you're proposing by way

6    of bail.

7              MR. MANSOLILLO:   All right.  Can I just finish

8    this last part, because it's outrageous, and it shows what

9    they did, the same as my (indiscernible).

10             They tell me, well, we don't control that.  DOJ

11   Washington office OIG, Professional Integrity, can tell any

12   agent what to do, okay.  I get a hysterical call.  I was

13   supposed to be down here for another case.  I get a

14   hysterical call -- I'm in Newport -- from his wife.

15             They rush up to -- he's at home from twelve

16   o'clock to four.  His wife goes out with the two kids.  He's

17   watching TV.  He's got a nine -- a window as big at the desk

18   right here, and I checked this; I've been at his house.

19   From the street you could see the TV, you can see the sofa,

20   and he's watching TV.

21             I find out later that they've been surveillance

22   there since twelve o'clock.  I get not call but I get an

23   hysterical at, you know, five o'clock that they stuck a gun

24   in her face with her kids, yanked her son by his shirt --

25   he's six years old -- out.  Wouldn't let her hold her kids.

1   Threw her up against the car.  Go inside, okay.  Then I get

2   a call from the FBI two hours later, I get a call from them,

3   the prosecutor's saying they were -- he was arrested without

4   incident, okay.  That's not the case.

5            What I'm proposing, Your Honor, is that he be

6   allowed to walk into the courtroom and if they want to go

7   through this in front of the judge down there, fine, and

8   I'll be there, and I'll be doing the same thing.  There's no

9   reason to hold this gentleman.  He has family ties.  The

10  only reason that he resigned is because I told him that this

11  mess is going to go on, possibly for two years.

12           He's got a 401K pension and $20,000 in his

13  accounts, every account.  They way they think this you'd

14  think he'd be hiding gold bars in his backyard underneath

15  the tomato plants.

16           I propose that he be released on only one

17  condition, to me, to take him tonight on plane.  I've got

18  two tickets, right to the courthouse, right to the judge.  I

19  see no other reason.  If he walks into that judge he's got a

20  better shot of getting bail than Mike Taylor does.  You can

21  review these if you'd like to.  They're tickets, airplane

22  tickets, to leave from -- right to Utah.  I have a hotel

23  stay right across the thing.  There is no reason that what's

24  happened to him, to hold him, all right.

25           This is a contrived -- this is so contrived that

1   it's disturbing.

2              THE COURT:   Okay.   Let me hear a little further

3   from the Government.

4              MS. LERNER:   Your Honor, I am surprised that Mr.

5   Mansolillo is suggesting that you release his client into

6   his custody when he has stand -- he stands there and has

7   misrepresented to you, in your face, exactly what happened

8   during the arrest of his client.   We called Mr. Mansolillo

9   while his client was en route, not two hours later.

10             The allegations he's making about the guns were

11  regarding the deputy U.S. marshals who we are very grateful

12  for their assistance in effectuating the arrest of Mr.

13  Lustyik.   There was no such thing that happened.   I am

14  baffled that Mr. Mansolillo is even making these

15  allegations.

16             I have a few other points that I'd like to quickly

17  make.   I'm not clear whether he represents Mr. Taylor or Mr.

18  Lustyik.   He spent a lot of time talking about the case in

19  Utah.   That's not this case.   This is the obstruction case.

20  We are not the Utah prosecutors.   We are the Public

21  Integrity Section and we are prosecuting Mr. Lustyik and Mr.

22  Taylor and another individual for obstruction of the other

23  case.   We brought this case separately because the Utah

24  AUSAs are witnesses in our case.

25             THE COURT:   But the charges against Mr. Lustyik

1  are pending in Utah, so.

2          MS. LERNER:  That's correct, Your Honor, because

3  it was a Utah investigation that he obstructed.  He

4  contacted agents in Utah.  He contacted AUSAs in Utah.  He

5  sent two reports to Utah and that's why the prosecution is

6  in Utah.

7          Mr. Mansolillo has been waving around the

8  complaint and saying it's lies and allegations.  These are

9  direct quotations from e-mail communications.  They are

10  direct quotations.  He will receive them all.  There is

11  nothing false about any of those communications.

12          He has made allegations about Mr. Taylor.  The FBI

13  has reviewed Mr. Taylor as a source and closed him for cause

14  and Mr. Lustyik was suspended as part of his handling of Mr.

15  Taylor.  We are here, Your Honor, to determine whether or

16  not Mr. Lustyik is a danger to the community.  We submit

17  that he is.  I would like to very briefly quote some of the

18  communications between him and person two, who is still at

19  large.  Our investigation is still continuing.

20          On September 8 when Mr. Taylor was stopped at the

21  border Mr. Lustyik told person two, Taylor just called.

22  He's just home.  Customs grabbed his phone and laptop.  He

23  wants to call you on his son's number.  Great, now I go to

24  jail, too, I'm so -- pardon my French -- fucked.  I told him

25  not to travel with electronics.

```
 1          And then he later says, Taylor might have got me
 2  jammed up and sent to jail so you better come -- so he
 3  better come through.  And he also says -- pardon, find the
 4  quotation -- you might have to save me and testify that
 5  you're the only one doing business with him.  This is what
 6  he tells person two on September 8.
 7          On September 12 he instructs person two to
 8  blatantly, I'm using that as a quote, blatantly ask Taylor
 9  for money.  One September 18 --
10          MR. MANSOLILLO:   Is blatantly the quote?
11          MS. LERNER:   Quote, he says blatantly.   On
12  September 18, as his house is being searched, he texts
13  person two and says I just got suspended and maybe arrested
14  today based on helping Captain.  And their term for Mr.
15  Taylor is Captain America.  Let him know ASAP.
16          As the search was going on in his house he was
17  still continuing his obstructive conduct.  That is why the
18  Government argues that he is a danger to the community and
19  he must be held without bond.
20          MR. MANSOLILLO:   Your Honor, I would like to
21  respond --
22          THE COURT:   Yes.
23          MR. MANSOLILLO:   -- to some of those.  One, I
24  have a witness who was there, if she doesn't think that
25  happened at the search -- at the arrest.  Listen, U.S.
```

1  Marshals are friends of mine.  They had a difficult job to

2  do and it wasn't their fault.  It was their fault telling

3  him that he's Attila the Hun and this is how they have to

4  execute this arrest warrant.  It was their fault to even do

5  the arrest warrant without having me or the ADIC, who both

6  offered to bring him anywhere they wanted.

7           On top of that, these new allegations that they

8  say, okay, about this person, that he attempted to destroy a

9  file.  This is an FBI agent who felt bad for him and came

10  over to his house two days later and he's talking about a

11  case file that was closed.  They don't say it was closed.

12  That was closed.

13           That FBI agent, and I don't want to name him by

14  name because he doesn't want to get him in trouble, they

15  were talking about how he messed up and how he was going out

16  socially with him, and he was going to get in trouble.  He

17  says, you ought to get rid of that file, just get rid of

18  that file.  They were saying that in jest.

19           This has been turned around.  The last allegation

20  that she said about the documents that were coming in, Mr.

21  Taylor had some of those documents, even though they weren't

22  classified yet because it was still raw material, they were

23  highly sensitive.  We contacted the agents down there and

24  they were explained that and that's what he's talking about.

25  He was going to get in trouble.  And, no, he did not get

1  suspended for what happened.  He got suspended because he

2  got arrested and he's soon to be under indictment and that's

3  what he got arrested -- got suspended for.

4          And I will present, if I have to, if this Court

5  requires me to, the partners in the whole chain of the FBI

6  agents that they put in these, along with his wife, to

7  explain the truth to what really happened to him.  He

8  deserves the right to walk into that judge and say, I'm

9  here, and that's what he said everyday that he got -- was

10  accused of what happened in this matter.

11          Also, I just -- my counsel, co-counsel gave me the

12  pretrial recommendation is to surrender his travel

13  documents.  He's got no problem with that.  No new

14  applications.  Travel restricted to Southern and Eastern

15  District of New York, and I ask for Boston myself, when it

16  happens, if he gets out from Utah.  But I'd at least like

17  him to have the opportunity to go to Utah as a man to fight

18  his -- these allegations.  And then if they want to hold him

19  down there then we'll just -- that'll be another story.

20  We'll address that then, but he deserves the opportunity.

21          The only reason that Mike Taylor's not out is

22  because they pulled this -- arrest him at the last minute,

23  they obstructed, and they're a flight risk.

24          THE COURT:  Bear with me a second.

25          MR. MANSOLILLO:  Your Honor, as other conditions,

1 if you don't want me to fly him right to the court tonight,

2 the Court can put any conditions you want.  The family has

3 meager means, however, he does have a house that has a

4 little bit of equity in it.  You can set the restrictions as

5 the Court deems necessary.  I would just like to be able to

6 help him on this trial while we go through, until trial, for

7 me -- for them to have to pay for me to go down to Utah with

8 almost -- it would be restrictive.  I'm already doing the

9 case pro bono.

10          THE COURT:   I missed the last part of that.  If a

11 case is in Utah you're going to have to --

12          MR. MANSOLILLO:   Well, with him being held in

13 Utah.

14          THE COURT:   Oh.

15          MR. MANSOLILLO:   Yes.

16          THE COURT:   Well, ultimately, I could release him

17 on his own recognizance.

18          MR. MANSOLILLO:   I would love that.

19          THE COURT:   The Utah judge will decide what's

20 appropriate so what I do, you know, I suppose may have some

21 influence but it's certainly not dispositive.

22          (Pause in proceedings.)

23          THE COURT:   I don't minimize the severity of the

24 charges here and notwithstanding everything that counsel

25 said, this may in fact be a strong case.  It may be a case

1  that is a result of misinterpretations.  Certainly the

2  quotations that appear in the Government's memorandum and

3  that were just recited in open court today are, to put it

4  mildly, troublesome.

5        But the defendant does have strong roots in this

6  community, and I don't believe that if he truly wanted to

7  communicate even classified information to others, that that

8  couldn't be done through intermediaries if I were to hold

9  him.

10        I am not going to grant the Government's request

11  to retain Mr. Lustyik.  I'm going to set bail at a $2

12  million personal recognizance bond to be co-signed by the

13  defendant's father, his mother, his wife, and his brother,

14  all of whom I take it are in court?

15        MR. MANSOLILLO:   The father is deceased, Your

16  Honor.

17        THE COURT:   Oh, I'm sorry.  I thought you

18  mentioned -- did you mention somebody else who is in court

19  other than the mother, wife, and brother?

20        MR. MANSOLILLO:   Sister-in-law, Your Honor.

21        THE COURT:   Well, I'm going to change it to three

22  co-signers, the mother, wife, and brother, all of whom will

23  have to sign the bond today.  Bear with me a second.

24        (Pause in proceedings.)

25        THE COURT:   I'm going to restrict the defendant's

1  travel to the Southern and Eastern Districts of New York and

2  the District of Utah.  The bond is going to be further

3  secured by the equity in the defendant's residence.  He's to

4  surrender all travel documents and not seek new ones.  He'll

5  be subject to strict Pretrial Services supervision with drug

6  testing and treatment as appropriate, because he declined

7  your analysis.

8          I've provided that the drug testing condition may

9  be lifted if he tests negative three times.  He'll be

10 subject to electronic monitoring and home detention and if I

11 didn't say it, strict Pretrial Services supervision.

12         The three co-signers will have to sign today.  The

13 electronic monitoring will have to be in place by October

14 5th and the security interest in the residence will have to

15 be posted by October 12th.  I further provided that the

16 defendant may travel to Utah on October 1 or 2 to surrender

17 there.

18         As you've heard, provided that your three

19 relatives assign the bond today and you sign it, you're

20 going to be released so that, as Mr. Mansolillo requested,

21 you can go to Utah to surrender there today or tomorrow and

22 assuming the Utah court sets the same conditions, you'll

23 have to fly immediately back in order to insure that the

24 electronic monitoring can be put in place.  And then we'll

25 have to make arrangements to secure your bond with your

34

1  residence.

2          But if you fail to comply with all of the

3  conditions I've set down, sir, you, your mother, your wife,

4  and your brother will each become liable for the full amount

5  of the bond and you and your wife stand to lose your

6  residence to the United States Government.  Do you

7  understand all that?

8          MR. LUSTYIK:   Yes, sir, I do.

9          THE COURT:   And do you understand that if you

10  fail to appear as required you could be charged with the

11  crime of bail jumping, so that even if you weren't in enough

12  trouble already, that charge could be added?

13          MR. LUSTYIK:   Yes, sir, I do.

14          THE COURT:   We need a control date in light of

15  the representation the defendant's going to surrender by, I

16  take it, tomorrow or the next day?

17          MR. MANSOLILLO:   Your Honor, our tickets are at

18  five o'clock.  I'm probably going to have to get them

19  changed, they're out of New Jersey.  I will get them changed

20  and I'll leave tomorrow.

21          THE COURT:   Okay.  I'm going to set a control

22  date of October 5th and I'm going to request, Mr. McGuire,

23  that you let me know on October 5th that the surrender has

24  already occurred?

25          MR. McGUIRE:   I will, Judge.

1          THE COURT:    Anything further concerning Mr.

2  Lustyik this afternoon?

3          MS. LERNER:    No, Your Honor.

4          MR. McGuire:    Thank you, Judge, nothing further.

5          MR. MANSOLILLO:    Thank you, Your Honor.

6          MR. LUSTYIK:    Thank you.

7          (Whereupon the matter was adjourned.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                                                                36

2                          C E R T I F I C A T E

3

4          I, Carole Ludwig, certify that the foregoing

5    transcript of proceedings in the United States District

6    Court, Southern District of New York, United States of

7    America v. Lustyik, Docket No. 1:12-mj-02559-UA, was

8    prepared using digital electronic transcription equipment

9    and is a true and accurate record of the proceedings.

10

11

12

13

14   Signature_____

15

16   Date:  October 17, 2012

17

18

19

20

21

22

23

24

25